1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  JAIME R. SANCHEZ,                    )   No. C 10-0439 LHK (PR)
                                         )
12              Petitioner,              )
                                         )
13      v.                               )   ORDER DENYING PETITION FOR WRIT
                                         )   OF HABEAS CORPUS; DENYING
14  R. E. BARNES, Warden,                )   CERTIFICATE OF APPEALABILITY
                                         )
15              Respondent.              )
    _____ )
16

17      Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254.  The Court ordered Respondent to show cause why the petition

19  should not be granted.  Respondent filed an answer addressing the merits of the petition.

20  Petitioner filed a traverse.  Having reviewed the briefs and the underlying record, the Court

21  concludes that Petitioner is not entitled to relief based on the claims presented and denies the

22  petition.

23                        **PROCEDURAL HISTORY**

24      On December 11, 2006, the Contra Costa County District Attorney filed an information

25  accusing Petitioner of the second degree murder of his wife, Latda Sanchez.

26      On June 5, 2007, a jury convicted Petitioner of second degree murder.

27      On July 3, 2007, Petitioner was sentenced to state prison for fifteen years to life.

28      On July 20, 2007, Petitioner timely appealed, raising the claims alleged in this present

1   petition.  On May 14, 2009, the California Court of Appeal affirmed the conviction, with minor

2   amendments.  On August 26, 2009, the California Supreme Court summarily denied review.

3   Petitioner did not seek collateral review in the state courts.

4        Petitioner commenced this federal action on January 29, 2010.

5   **BACKGROUND**[1]

6       ***Prosecution Case***

7          P.M. was 18 years old at the time of trial.  She met appellant in the
    summer of 2004 when she was 15 years old and when appellant, who was
8   about five years older than her, came to work as a personal caregiver at
    Tiffany Court, an assisted living facility in Walnut Creek where P.M.'s father
9   was the administrator and where P.M. volunteered.  She and appellant became
    friends right away.  She learned that several other members of appellant's
10  family also worked at Tiffany Court, including his brother, mother, cousins,
    uncle, and aunt.  P.M. initially believed appellant was single, but then learned
11  that he was married to Latda, who also worked at the facility.

12         Initially, P.M. and appellant just talked at work and on the telephone.
    Later, they began going out together about three or four times a week.  In
13  December 2004, the relationship became sexual.  During this time, appellant
    lived with his family, but not his wife.  In about January 2005, Latda became
14  very upset and jealous when appellant and P.M. would talk at work.  Latda
    went to P.M.'s father about it; he did not believe her and "let her go."  At some
15  point, appellant told P.M. that he was seeing another woman named A.B., and
    he distanced himself from P.M.

16
           Appellant and Latda got divorced in 2005.  But, after he received a
17  letter of deportation from the government, appellant remarried Latda and
    moved to Florida in September or October 2005.  Appellant said he was going
18  to be with Latda in Florida until he obtained his immigration residency to stay
    in the United States, and also said that he and P.M. would hopefully be
19  together again once he got his "paperwork."

20         After appellant and Latda moved to Florida, he and P.M. talked on the
    phone about four times a week and she also wrote letters to him.  In December
21  2005, appellant and Latda returned to California and appellant began working
    at Tiffany Court again.  His and P.M.'s sexual relationship also resumed and
22  they talked about getting married in the future, although appellant did not
    intend to leave Latda until he got his immigration paperwork.  Once appellant
23  and Latda got an apartment, P.M. went there regularly while Latda was at
    work.  In July 2006, she went there almost every day after summer school.
24
           Also in July 2006, appellant had an interview related to his
25  immigration paperwork.  Before the interview, he told P.M. that he was

26  --------------------------------

27     [1]  The facts of this case are taken from the California Court of Appeal opinion in *People
    v. Sanchez*, No. A118552, 2009 WL 1348164 (Cal. App. 1 Dist. May 14, 2009).  (Resp. Ex. C
28  ("Op.")).

having a sexual relationship with Latda to keep her happy for the interview.

On July 21, 2006, P.M. called appellant when her summer school class was over and he picked her up in his car. They got food at a taqueria, then went to Blockbuster and picked out a few movies. They then went to appellant's apartment. They did not expect Latda to be home until 9:00 p.m., after she left work.

P.M. and appellant sat on the floor leaning against the couch; they ate and watched the movie, "King Kong." At some point, they both removed their clothes down to their underpants as they watched the movie. Suddenly, the door opened. Latda was there and she saw both of them. Latda "freaked out" and appellant went and grabbed her by the arm, trying to pull her into the apartment. P.M. saw Latda trying to get appellant to let go of her before she (P.M.) went and hid behind a closet door.

Appellant then came back into the apartment and put on his clothes; P.M. told him to hurry up and go after Latda. After appellant went outside, P.M. got dressed. About 10 minutes later, Latda and appellant returned to the apartment. Latda came up and "got in [P.M.'s] face" and yelled at her to get out of the apartment, which P.M. did. P.M. then walked around outside trying to figure out what to do. Eventually, she sat down in the parking lot and started to cry. She was afraid that Latda would go to her father, which she believed would get her in a lot of trouble and, in addition, many members of appellant's family would lose their jobs at Tiffany Court. A woman twice came up and asked her if she was alright, and P.M. said she was.

Approximately 30 minutes to an hour after she left the apartment, appellant called P.M. on her cell phone and told her to come into the apartment. P.M. refused because Latda was still there. She tried to get appellant to come outside and take her home, but she finally agreed to go back to the apartment when appellant kept insisting that she do so.

Appellant unlocked the door to the apartment and P.M. went inside. Appellant was inside pacing; he looked worried. She asked what was wrong and appellant said, "Latda's dead." She did not believe him, but he started sobbing and saying he did not mean to do it. He said, "if you don't believe me, go look in the bathroom." P.M. went into the bathroom and saw Latda's clothes on the floor. She then saw Latda lying sideways in the tub, with her back facing P.M. There was water in the tub and she did not see Latda move. When P.M. asked appellant if he was sure that Latda was dead, he said he was sure. Appellant explained that "he forced her head into the water by pushing down on it."

P.M., who was in shock, backed away from the bathroom. Appellant tried to hug her, saying "that he didn't mean to do it, and that he went too far, that he was just trying to scare her; that he was -- he just didn't mean to do it . . . ." He told P.M. that he was thinking about P.M., her dad, and his family while he was trying to scare Latda. Appellant, who was not wet, asked P.M. what she should do and she said she did not know. He then talked about some options regarding what he could do. These included taking Latda's body out of the apartment late at night and saying that she had disappeared, turning himself in, or saying she had committed suicide and making it look like a suicide. He ultimately decided to make it look like a suicide.

Appellant then drove P.M. to her friend's house, which was located about 15 to 20 minutes away from the apartment. Appellant told her not to say anything to anyone, but that he was going to say it was a suicide. He also showed her scratches on his arm that he said he got when he was forcing Latda's head under water. He said he was going to try to cover the scratches up. When P.M. arrived at her friend's house, she learned her friend was not home. So she walked to her own home.

Appellant called P.M. more than once after she got to her house. The first time, he said he was being detained and questioned. He told her to say she had been out with him and when he returned home, he found Latda there. He repeated that the story was going to be that Latda committed suicide. During another phone call, appellant asked if P.M. had told his family what appellant had told her to say. P.M. had talked to appellant's mother, Sylvia, and his brother, Carlos, and told them the story appellant told her to tell. Carlos told P.M. that the police were going to contact her for questioning. Carlos also talked to P.M.'s father and told him what had happened.

P.M.'s father immediately arranged for her to go to the police station for an interview, with an attorney on a speaker phone. During the interview, which took place at about 2:00 a.m., P.M. told the police what appellant had told her to tell them.

A few days later, P.M.'s father and a friend of his drilled her about the story she had told to the police, which she said was true. Afterwards, her mother came to her and told her to tell the truth. P.M. broke down and told her mother the truth. A couple of days later, P.M. gave another police interview and told the truth about what had happened. She gave this interview as part of an immunity deal in which she would not be charged with a crime if she agreed to tell the truth and come to court when required, and if she was also willing to take a lie detector test if asked and go back to the crime scene and show what had happened.

P.M. identified several love letters from appellant. One letter described P.M. as "the best ever happen to me [sic ]" and "the most wonderful girl in the earth." Another letter said, "I am right here in the darkness waiting to get out of here and be next to you dear angel. . . . [W]hat I can do to have you with me, who -- how have to kill [sic ], what I have to do." In yet another letter, appellant wrote, "Oh, all my love. I don't know what I have to do or who do I have to kill, but -- but what I do know is that I'm sure . . . that it won't be impossible to like obtain your love. And one day I can live with you for a long time."

Cynthia Cooper, who lived in the same apartment complex as appellant, testified that on July 21, 2006, she left her apartment at about 6:15 p.m. As she walked to her vehicle, she saw appellant walking behind his wife toward their apartment building from the Laundromat area. He was saying, "hey, hey," but his wife just kept going. Cooper left in her car, but returned about an hour later. While in the parking lot, she saw appellant coming back down the stairs of his apartment building. She also saw a young Hispanic female in the parking lot looking up toward appellant's apartment. The young woman was crying; she seemed upset. Cooper saw appellant and the young woman start to leave together in appellant's car. Appellant then backed the car up, stopped, got out of the car, and went back up the stairs towards his apartment. He came right back down and left.

1

2          Cooper had occasionally heard yelling coming from appellant's
    apartment, like "domestic arguing."  She also saw "other females entering
3   [appellant's] apartment with him" at different times.

4          Concord Police Officer Jeff Krieger testified that on July 21, 2006, he
    received a dispatch call at 8:19 p.m. regarding a man's wife drowning in the
5   bathtub.  When he arrived, he knocked at the open door of the apartment and
    when there was no reply, he entered.  Appellant came out of the bathroom,
6   screamed "no," and fell to his knees in front of the officers.  It seemed strange
    to Krieger that there was no sound when the officers first arrived.  It also
7   seemed odd how appellant screamed and fell to his knees, but was not crying
    and was not wet.

8          When Krieger went into the bathroom, he saw the victim lying in the
    bathtub; there were about nine inches of water in the tub.  Her head was at the
9   drain end and she was facing him in a semi-fetal position.  She was unclothed.
    There was also a pillow, bent into a V shape, under her head.  Her face was
10  partially submerged in water.  There was a pile of clothes and a pair of shoes
    together on the floor; the clothes were dry.  There was a second pair of larger
11  shoes nearby on the floor.  Krieger first checked for a pulse and found none.
    He started to drain the water from the tub, but stopped because he thought it
12  might have evidentiary value.  Both the water and the victim were warm.

13         Krieger took off the shower doors to try to get the victim out of the
    tub.  He noticed a razor in the water near her feet.  He and another officer got
14  the victim out of the tub and put her on the bathroom floor.  Firefighters
    arrived at that point and began emergency efforts on the victim, but they and
15  paramedics who arrived thereafter were unable to revive her.

16         Maryann Duncan, a Concord Police Department forensic specialist,
    testified that she went to the apartment on July 22, 2006 to diagram the scene
17  and collect evidence.  In the living room, she saw blankets, pieces of clothing,
    and food and drink containers on the floor in front of the couch near the
18  television; there was a DVD of King Kong in the DVD player.  In the kitchen,
    inside a trash bag, Duncan found bunched up masking tape with long brown
19  hairs attached.

20         Sergio Solis, also a forensic specialist with the Concord Police
    Department, testified that he went to the apartment early on the morning of
21  July 22, 2006.  While there, he saw several scratch marks on appellant's left
    arm near his elbow.  When he turned on the water knob in the bathtub, water
22  came from the shower instead of the bathtub faucet.  Solis also saw the
    wadded up masking tape with the hair on it which, when unfolded, was about
23  seven inches long by one-and-one-half or two inches wide.  Coming off the
    seven-inch strand of tape was a longer strand of tape that could have formed a
24  loop.

25         Tuan Nguyen, a deputy sheriff criminalist for the Contra Costa County
    Sheriff's Office, qualified as an expert in DNA analysis.  He examined the
26  hairs found on the masking tape and testified that Latda was the likely source
    of the hairs.  DNA on the tape was a mix of male and female.

27         On July 22, 2006, Concord police detective Kurt Messick executed a

28

search warrant at the apartment.  In the apartment, Messick found various documents including a letter from the Immigration and Naturalization Service, dated December 8, 2005, denying appellant and Latda's application and stating that their marriage was considered to be a "sham."  On a nightstand in the bedroom, Messick found a roll of masking tape with a strand of dark hair underneath the tape end.

Julie Smith, an identification technician with the Modesto Police Department (previously a forensic specialist with the Concord Police Department), also inspected the scene.  Latda's jeans, found on the floor inside the bathroom, appeared to be inside-out.

Forensic pathologist Kelly Arthur performed an autopsy on Latda on July 22, 2006.  Latda, a small-framed Asian woman, weighed approximately 110 pounds and was approximately five feet tall.  She was 35 years old at the time of her death.  FN1.

FN1. Appellant is five feet eleven inches tall and, at the time of Latda's death, was 22 years old and weighed 195 pounds.

Dr. Arthur found bruising around both of Latda's eyes, a small scrape on the side of her nose, a bruise on her tongue, three bruises on her left upper arm, bruising around her left elbow, two bruises on her left forearm, bruises and a scrape on her left wrist, bruising on her right upper arm and right elbow, and a bruise on the back of her right hand.  These bruises were very fresh and Dr. Arthur believed they were all pre-death injuries.  The arrangement of the arm bruises was consistent finger marks.

Latda also had hemorrhages on the hyoid bone caused by neck compression, which might include manual strangulation.  This injury appeared to have occurred before or at the time of death.  It was unlikely but still possible that this injury occurred during emergency resuscitative efforts.  Dr. Arthur also found petechiae-small hemorrhages caused by blood vessels rupturing ante mortem-in the eyes; this finding was also consistent with, inter alia, manual strangulation.  In rare cases, petechiae in the eyes can be caused by cardiopulmonary resuscitation (CPR).  However, where a person has been dead for an hour before CPR was begun, Dr. Arthur would not expect to find them.

Dr. Arthur concluded that the cause of death was drowning, with a contributory condition of blunt force injuries.  Dr. Arthur described the evidence that led her to form the opinion that Latda had drowned.  This included extra fluid on the lungs, watery fluid in the stomach, and water in the sphenoid sinus.  Water in the sinuses is caused by forceful attempted respirations as a person is drowning.  Dr. Arthur explained that when a person's head is held underwater, it takes about 30 to 60 seconds for the person to become unconscious.  It then takes another four to six minutes underwater for the person to actually drown.

No drugs or alcohol were found in Latda's blood.  Dr. Arthur testified that it is "exceedingly difficult to drown yourself," and a person would have to be under the influence of alcohol or drugs to do so in a bathtub.

A.B., who was 26 years old at the time of trial, testified that she had

met appellant at a Burger King while she was working at the drive-through window in the summer of 2005. Appellant introduced himself and asked for her phone number. He called her later that day and soon they began a dating relationship. Later, they moved in together in Walnut Creek with appellant's mother, grandmother, and brother. Appellant said he was in the process of getting a divorce.

One day, appellant and A.B. got into an argument because "he wanted to become a millionaire and why didn't I support him." Appellant threw A.B. down onto the bed and started hitting her in the face. This caused her to suffer a swollen cheek. Three days later A.B. moved out of the house and moved in with her mother.

A.B. continued to see and talk to appellant after that. At one point, appellant called her and said he was in Mexico, which she later learned was not true. Later, he told her he was living in Florida with his uncle and aunt. Appellant called A.B. frequently while he lived in Florida. When appellant returned from Florida in January 2006, he and A.B. resumed their sexual relationship. Some weeks later, he told A.B. he had remarried his wife after A.B. found the registration card in appellant's car and saw his wife's name on it. Appellant said he had remarried his wife because he wanted to get his green card.

A.B. continued to date appellant in 2006, but stopped going out with him in July 2006. One day that month, she was at appellant's apartment, talking with him in the living room, when Latda came home. As Latda started to come in through the front door, appellant held the door closed so she could not come in. Then Latda started coming in through the bedroom window, at which point A.B. left through the front door. Another day, also in July 2006, when A.B. was talking with appellant on the phone, he told her that "he had an interview with immigration about the papers." He said he had to be living with his wife because they had an interview. During that conversation, appellant expressed frustration about his wife, saying, "I am tired, I am fed up with her. One of these days I am going to kill her."

Melinda Coby testified that Latda's sister, Nantha, was her best friend and that she had known their family for over 20 years. Coby described a conversation she had with Latda at a birthday party at a bowling alley in June of 2004 or 2005. They had not seen each other in a few years and Latda started talking about her husband. She told Coby that appellant had choked her and physically put her out of the house so that she could not get back inside. Latda said this had happened after they had started fighting about his infidelity.

Jasmine Wilson testified that she worked at Systron Donner, a manufacturing company, initially as a chip maker. When she first started working there, Latda trained her and they became close. They would eat lunch together and talk about their personal lives. Wilson remembered Latda once telling her that she had had to climb into her apartment through the bathroom window because there was a female inside and Latda could not get in through the front door. The female ran out of the house and Latda and appellant started arguing. Appellant grabbed her arm; Wilson saw the bruises.

On July 21, 2006, the last day Wilson saw Latda, Latda told her that

she was sick and tired of everything and did not want to go home.  She said
she wanted to go to her mom.  Latda also said she was not sure if she was
pregnant and was supposed to find out that week if she was.  That day the
company closed down early, at about 6:00 p.m., because of the hot weather.

Daesha Lumho, another coworker of Latda at Systron Donner, testified
that she and Latda sometimes had personal conversations during breaks and
lunchtime.  Latda told Lumho that she had seen a girl in the parking lot and
when she confronted appellant about it, he argued with her and hit her.  The
last day Latda was at work, Latda said she was going to leave appellant and
go to her mom's house.  That day, Lumho saw an old bruise on Latda's arm,
but she did not see any bruises on Latda's face.

Melvin Cleveland testified that he had been a temporary worker at
Systron Donner in the summer of 2006 and he and Latda were work friends.
He said that Latda told a group of friends, including him, that appellant was
abusive, that he would hit her, smack her, call her names, push her around.
Cleveland described it as "Ike and Tina Turner type of abuse."  Latda said she
was tired of the heartaches and the cheating, and the group was trying to get
her to leave appellant.  On that last day, Latda said she was going to leave
appellant and move in with her sister.  She did not have any bruises on her
face at that time.

### Defense Case

Appellant testified on his own behalf.  He began working at the
Tiffany Court facility in January 2003.  He met Latda there two weeks later
and they got married in April 2003.  At first, they lived with appellant's family
but, after about seven months, they moved out on their own.  They started to
develop issues early in their marriage because Latda was jealous of any
younger women at their work.  Latda explained her jealousy by telling
appellant that she had previously married a man who left her for another
woman after he got his green card.  She also said that she had dated a Spanish
guy who went to Mexico and never came back.  Latda filed for divorce after
they got into fights about other girls.  They separated in April or May 2005.
After the divorce, appellant and Latda continued to have a sexual relationship.
He also started dating P.M. and A.B., and moved in with A.B. for less than a
month.  He missed Latda and decided he wanted to work things out.  He
talked to her about going to his upcoming immigration interview together,
which they did without telling the authorities that they were divorced.  After
the interview, Latda and appellant started dating again and they remarried on
October 15, 2005.

Appellant and Latda decided to move to Florida because they thought
that separating themselves from the people of whom Latda was jealous would
help them.  However, Latda remained jealous.  While in Florida, appellant
stayed in communication with P.M. and later with A.B. also.  Appellant and
Latda moved back to California in January 2006.

After their return to California, appellant started seeing P.M. again,
first as a friend; a few months later they became romantic again.  After the
return from Florida, appellant saw A.B. romantically only once, in his
apartment.  A.B. left many letters for both appellant and Latda at their
apartment and on their car.  This caused fights between appellant and Latda,

which included shouting and pushing and Latda throwing things. Latda threatened to call immigration officials many times when appellant would not do what she asked of him. In the meantime, appellant's relationship with P.M. changed and they became a couple. Appellant testified that he mentioned killing someone in a letter to P.M. because he knew she had been sexually abused by a relative and he wanted her to feel protected.

About two weeks before Latda's death, Latda came home early from work and found A.B. with appellant. As Latda was walking in, appellant closed the front door, but Latda jumped in through the bedroom window. Appellant detained her while A.B. left through the door.

About three days before Latda's death, appellant drove a woman named Grace around while she did some errands. When appellant came home, he found Latda crying in the dark. She said she was angry because she had not been able to find appellant and someone had seen him with Grace. After appellant found a bowl with tape in it, Latda told him she had tried to kill herself by covering her face with tape and wrapping more tape around her head, but it had not worked.

On July 21, 2006, appellant called P.M. and asked her to get together. He picked her up and they got food and movies before returning to appellant's apartment by 4:00 p.m. They ate, chatted, and watched a movie. They both ended up in only their underwear because they were going to have sex. Latda came home unexpectedly and entered the apartment. Appellant went toward the door as Latda turned around to leave. He wanted to stop her so he could explain what was going on. Latda began to struggle with appellant and put her nails into his arms; appellant let go of her and she left.

Appellant then got dressed and left the apartment to look for Latda. He saw her running toward the street and he sprinted after her. When Latda asked what he was doing with P.M., appellant said they were going to go swimming. Latda did not believe him. He told her to calm down and said they should go back to the apartment to talk. Appellant took her hand and asked her to forgive him. He still loved her.

It took appellant 15 to 20 minutes to get Latda to return to the apartment where he wanted to explain things to her. P.M. was still in the apartment and Latda started shouting at her; P.M. left. Latda was very angry and was yelling at appellant that she hated him and wanted to leave him. She also said she would talk to his family and her family. Appellant offered to leave and Latda knelt down and begged him not to leave. Appellant tried to hug her, but she said he was dirty because he had touched P.M.

Appellant then went into the bathroom and started taking a shower. Latda came into the bathroom and continued talking to him. After appellant said he was not going to leave and go with P.M., Latda calmed down. Latda started to get undressed and said she was going to take a shower with him. When she got in the shower, appellant hugged her and said he was very sorry for all that he had done. She believed him and, as he started filling up the tub with water, she went to get some bubble soap. Latda then turned off the shower and got into the bathtub. They sat facing each other in the tub and talked about moving to Mexico. Latda started crying and appellant moved next to her to hug her. They both lay on their sides, facing each other while

1    talking.  Appellant also kissed her.

2        At some point, Latda turned her back on appellant because she was
     angry with appellant; she said she could not believe in him or that he would
3    change his ways.  Appellant wanted to scare her so he grabbed her by the
     mouth with his left hand and submerged her in the water; he also went under
4    the water.  He held her under water for less than a minute.  She did not react
     while he held her under water.  But when he let go, he turned around and saw
5    that she was not moving.  She started to shake and he lifted her up.  He then
     ran and got a pillow and put it under her because he had learned at work that
6    if a person fell, you had to make them comfortable until paramedics arrived.
     He tried pushing on her stomach and doing mouth-to-mouth breathing, but it
7    did not help at all.

8        Appellant, who had taken one CPR class, performed CPR on Latda for
     five minutes, but it did no good.  He thought about calling the police, but he
9    was afraid they would not believe him.  Instead, appellant called P.M. and
     asked her to come up to the apartment.  When she came in, he told her that
10   Latda had died.  When P.M. asked why he had done it, appellant said he only
     wanted to scare Latda; he did not want her to die.

11
         Appellant discussed with P.M. what to do, including calling the police
12   or doing something with the body.  P.M. suggested going to Mexico, but
     appellant said he could not leave a person in the bathtub.  Appellant said
13   he was going to call the police and tell them it was a suicide.  Appellant drove
     P.M. to a friend's house, about 20 minutes away from his apartment.  He then
14   returned to Concord and drove around before going back to his apartment.

15       Once home, appellant called 911 and said he had found his wife and
     she was not breathing.  When officers arrived, appellant came out of the
16   bathroom and screamed, "no, no."  Appellant spoke with Officer Warnock,
     who was a "very nice person," both at the apartment and later at the police
17   station.  Both times, appellant lied and told him that he had been with some
     friends and that when he came back to the apartment, he had found Latda
18   there.  Specifically, he told the officer that he had left the apartment after an
     argument and when he returned, he noticed a strange smell in the bathroom.
19   He said that he went into the bathroom and saw his wife in the bathtub.

20       Eventually, appellant told police about P.M., but never told what had
     really happened in the bathtub because he was afraid.  He continued to say
21   that Latda had committed suicide.  Appellant was interviewed by Detective
     Cruz at the police station.  Appellant told him that, on the night of her death,
22   Latda had threatened to call appellant's mother and brother and P.M.'s father.
     But that was not true.  He also said that Latda had slapped him in the face two
23   or three times and had hit him with a pillow.  This also was not true.  Latda
     had never hit him.  He told Detective Cruz that he had never hit Latda.

24
         Appellant acknowledged that the things Latda had told witnesses
25   about appellant pushing and slapping her were true, although he denied ever
     choking her.
26
     **Rebuttal**
27
         Concord Police Officer Michael Warnock testified that he was
28   dispatched to the scene at about 8:15 p.m. on July 21, 2006 regarding a

possible suicide. He talked with appellant, who told Warnock that he and his wife had gotten into an argument over her belief that appellant was cheating on her. He said he left the apartment and went for a drive to calm down; he was gone for about an hour. When he came back, he watched TV briefly before looking for his wife. He found her unmoving in the bathtub and called police. Appellant said their argument had not been physical, though he did say that, before he left the apartment, Latda had grabbed his arm to keep him from leaving. He pushed her away and, in doing so, she scratched his arm.

Officer Warnock asked appellant to come to the police department for a more in-depth interview and appellant consented. Officer Warnock took appellant into a regular interview room and told him that he was not under arrest and that the door would be closed for privacy reasons. The interview with appellant was videotaped. Officer Warnock also talked to appellant while appellant smoked a cigarette in the parking lot of the police department. They both then returned to the interview room. Officer Warnock asked appellant not to leave the room without an officer because the Concord Police Department is a secured facility.

A videotape of interviews with appellant, first by Officer Warnock and then later by Detective Cruz, was played for the jury. Before the interview with Warnock started, appellant was told he could use the telephone in the room to call his mother; appellant called and talked to his brother. In the first interview, appellant told Warnock that P.M. was just a friend. He also said Latda's family did not like him because they thought he was using her for immigration purposes. About two weeks earlier, A.B. came to his apartment and Latda came home while they were talking. Latda "went crazy" and started beating up A.B.. Appellant locked Latda out of the apartment, but she came in through a window as A.B. left through the front door.

Appellant said that Latda "was always arguing about something." On the night of her death, Latda came into the apartment and found appellant and P.M. watching television. He said he had called P.M., who was a friend from work, and a few other friends to come and watch some TV. When Latda arrived, appellant told P.M. to wait outside. Then he and Latda argued, and Latda slapped his face. Appellant tried to get away, but Latda tried to force him to stay, so he finally pushed her and she sat down on the couch. As he was leaving, Latda grabbed his arm. When he pulled away, her nails went into his arm.

Appellant drove P.M. to her friend's house and then drove around. When he got home, he saw Latda's car, but did not see her in the apartment. He started watching King Kong, but then noticed a bad smell. He went into the bathroom and saw Latda there. He started pumping her stomach. She was cold and there was water coming out of her nose. The 911 operator told him to get her out of the tub. He tried pulling her out of the water, but could not. So he got a pillow from the bedroom to put under her head. He threw up in the bedroom.

Appellant and Latda had attended their immigration interview the previous Tuesday or Wednesday.

At 1:05 a.m. on July 22, 2006, Detective Cruz and Officer Moore began interviewing appellant. Appellant repeated his story about the argument with Latda and how he found her in the bathtub when he later came

home.  When Officer Moore asked if appellant thought Latda had committed suicide, he said, "What else can I believe?"  Appellant later said he believed Latda had drowned herself.  Appellant also said that Latda did not know how to swim, was scared of the water, and always stayed in the shallow area at the pool.

Appellant admitted that he had a sexual relationship with P.M..  He said that he was always used to having two or three girls at the same time, and that his brothers said he was sick.  He acknowledged that Latda was going to tell his family, her family, and P.M.'s family about him and P.M.  He also said Latda slapped his face on the night she died; he was not upset about it because he was guilty of cheating on her.  He saw the masking tape with the hair on it and Latda said she made it.  Appellant thought she might have tried to suffocate herself with the tape the day before.

(Op. at 2-16.)

## LEGAL CLAIMS

As grounds for federal habeas relief, Petitioner alleges that the trial court: (1) violated his right to due process when it admitted evidence of prior acts of domestic violence;  (2) violated his right to due process when it admitted autopsy photographs; and (3) violated his constitutional rights when it admitted his videotaped statements to Detective Cruz.[2]

## DISCUSSION

I.    Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

_____

[2]  The Court recognizes that the March 31, 2010 Order to Show Cause stated that Petitioner had raised six claims.  (Mar. 31, 2010 Order at 2.)  However, upon further review, Petitioner had actually only raised the three claims stated above.  Furthermore, the parties only address these three claims in their briefs.

1    the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).   The first prong

2    applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v.*

3    *Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on

4    factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

5            "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

6    arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

7    the state court decides a case differently than [the] Court has on a set of materially

8    indistinguishable facts." *Terry*, 529 U.S. at 412-13.  A state court decision is an "unreasonable

9    application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the

10   state court correctly identifies the governing legal principle from the Supreme Court's decisions

11   but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

12   federal court on habeas review may not issue the writ "simply because that court concludes in its

13   independent judgment that the relevant state-court decision applied clearly established federal

14   law erroneously or incorrectly." *Id.* at 411.

15           Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination

16   will not be overturned on factual grounds unless objectively unreasonable in light of the

17   evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.  The Court must

18   presume correct any determination of a factual issue made by a state court unless Petitioner

19   rebuts the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. §

20   2254(e)(1).

21           In determining whether the state court's decision is contrary to, or involved an

22   unreasonable application of, clearly established federal law, a federal court looks to the decision

23   of the highest state court to address the merits of Petitioner's claims in a reasoned decision.

24   *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here, that decision is the opinion of

25   the California Court of Appeal.

26   II.     Petitioner's Claims

27           A.      Trial Court Erred in Admitting Evidence of Prior Acts of Domestic Violence

28           Petitioner claims as a violation of his due process rights the admission of: (1) his prior

acts of domestic violence against A.B. (one of his extramarital girlfriends) and the victim, under

Section 1109 of the California Evidence Code, and (2) hearsay testimony regarding domestic

violence against the victim, under Section 1370 of the California Evidence Code.  Petitioner

contends the trial court abused its discretion by admitting such evidence, which he argues should

have been excluded under Sections 1109 and 352 of the California Evidence Code.  The

appellate court summarized the factual basis for Petitioner's claim as follows:

> Before trial, the prosecution moved to admit evidence of prior acts of
> domestic violence by appellant against Latda and A.B., pursuant to section
> 1109.  The prosecution further argued that the proposed hearsay testimony
> regarding domestic violence against Latda was admissible under section 1370.
> Defense counsel objected to admission of this evidence under sections 1109
> and 352.  With the exception of one witness, whose testimony was excluded,
> the court ultimately ruled that all of the proposed testimony regarding the
> prior incidents was admissible under sections 1109 and 352.  The court found
> that the prejudicial effect of the evidence did not outweigh its probative effect,
> noting that the prior acts were of a much lesser magnitude than the charged
> homicide.  The court further found that the evidence would not consume an
> excessive amount of time.
>
> During trial, Latda's friend, Melinda Coby, and her coworkers,
> Jasmine Wilson, Daesha Lumho, and Melvin Cleveland testified regarding
> what Latda had told them about appellant's prior abuse of her.  A.B. testified
> about abuse appellant had inflicted on her while they were living together in
> 2005.

(Op. at 17.)

Section 352 of the California Evidence Code provides as follows: "The court in its

discretion may exclude evidence if its probative value is substantially outweighed by the

probability that its admission will (a) necessitate undue consumption of time or (b) create

substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Cal.

Evid. Code § 352.

Section 1101 of the California Evidence Code provides as follows:

> (a) Except as provided in this section and in Sections 1102, 1103, 1108, and
> 1109, evidence of a person's character or a trait of his or her character
> (whether in the form of an opinion, evidence of reputation, or evidence of
> specific instances of his or her conduct) is inadmissible when offered to prove
> his or her conduct on a specified occasion.
>
> (b) Nothing in this section prohibits the admission of evidence that a person
> committed a crime, civil wrong, or other act when relevant to prove some fact
> (such as motive, opportunity, intent, preparation, plan, knowledge, identity,
> absence of mistake or accident, or whether a defendant in a prosecution for an

unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness.

*Id.* § 1101.

Section 1109 of the California Evidence Code permits the admission of evidence of the petitioner's offenses involving domestic violence, subject to a balancing test of the evidence's probative value against its prejudicial effect, in accordance with section 352. *Id.* § 1109(a)(1). Subsection (a)(1) of section 1109 provides:

(a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.

*Id.*

The state appellate court addressed Petitioner's claim as follows:

### 1. *Proper Use of Propensity Evidence*

Appellant acknowledges that evidence of prior acts of domestic violence may be admitted under section 1109 to prove a defendant's propensity to commit domestic violence. He argues, however, that such evidence is not admissible to show a defendant's "general violent character" or to "establish intent to kill." Appellant cites the prosecutor's closing argument to show that the evidence was put to such an improper use in this case. The prosecutor argued: "If you find that the defendant committed domestic violence on a prior occasion, [A.B.] the one [sic ], you may find that he had a disposition to commit domestic violence, murder, being domestic violence, as well, and you can infer that he was violent on July 21st of 2006, and that he committed murder, that he intentionally murdered his wife."

The legislative history related to section 1109 reflects the Legislature's belief that "'[t]he propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. . . .' (Assem. Com. Rep. on Public Safety (June 25, 1996, pp. 3-4.)" (*People v. Johnson* (2000) 77 Cal. App. 4th 410, 419.)

This legislative history demonstrates that prior domestic violence evidence is not admissible simply to show the defendant is a generally violent person. Rather, its admission permits the jury to infer that, when a defendant committed a particular act -- in this case, holding his wife's head under water -- he acted in conformity with an escalating pattern of abuse, "a larger scheme

of dominance and control," and not, for example, in the heat of passion. (See *People v. Johnson*, *supra*, 77 Cal. App. 4th at p. 419.) The evidence in this case was admitted for a proper purpose and the prosecutor was not wrong to argue as she did.

We now turn to appellant's specific objections to the admissibility of particular instances of domestic violence.

## 2. *Admissibility of Latda's Hearsay Statements under Section 1370*

Appellant contends the testimony of Melinda Coby, Jasmine Wilson, Daesha Lumho, and Melvin Cleveland regarding what Latda had told them about appellant's acts of domestic violence against her was inadmissible hearsay because it did not satisfy the requirements of section 1370. Appellant acknowledges that defense counsel failed to object to admission of this evidence on this ground, but argues that counsel thereby provided ineffective assistance.

Respondent agrees that this testimony did not qualify for admission under the hearsay exception of 1370, but argues that appellant has failed to demonstrate that he was prejudiced by counsel's failure to object.

For a hearsay statement regarding infliction or threat of physical injury to be admissible under section 1370, numerous conditions must be met, including the condition that "[t]he statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official." (§ 1370, subd. (a)(5).) FN3. Here, it is undisputed that Latda's comments to her friends and coworkers did not satisfy subdivision (a)(5) of section 1370. The question therefore is whether counsel was ineffective for failing to object on this ground to the evidence's admission.

FN3. Section 1370 provides in full: "(a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met:

"(1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.
"(2) The declarant is unavailable as a witness pursuant to Section 240.
"(3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section.
"(4) The statement was made under circumstances that would indicate its trustworthiness.
"(5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official.
"(b) For purposes of paragraph (4) of subdivision (a), circumstances relevant to the issue of trustworthiness include, but are not limited to, the following:
"(1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested.
"(2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive.

1            "(3) Whether the statement is corroborated by evidence other
than statements that are admissible only pursuant to this section.

2            "(c) A statement is admissible pursuant to this section only if
the proponent of the statement makes known to the adverse party the

3    intention to offer the statement and the particulars of the statement
sufficiently in advance of the proceedings in order to provide the

4    adverse party with a fair opportunity to prepare to meet the statement."

5            To prove ineffective assistance of counsel, a defendant must show that
"counsel's representation fell below an objective standard of

6    reasonableness . . . under prevailing professional norms." (*Strickland v.
Washington* (1984) 466 U.S. 668, 688.)  In addition, the defendant must

7    affirmatively establish prejudice by showing "that there is a reasonable
probability that, but for counsel's unprofessional errors, the result of the

8    proceeding would have been different.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome." (*Id.* at p.

9    694.)  "If it is easier to dispose of an ineffectiveness claim on the ground of
lack of sufficient prejudice, . . . that course should be followed." (*Id.* at p.

10   697.)

11           Here, assuming counsel's failure to object constituted inadequate
representation, his ineffectiveness was not prejudicial because appellant has

12   not established that "there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been different."

13   (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

14           First, the record contains strong evidence that appellant had physically
assaulted Latda shortly before her death.  Pathologist Kelly Arthur concluded

15   Latda had died of drowning, with a contributory condition of blunt force
injuries.  Dr. Arthur believed that various fresh injuries to Latda, including

16   bruising on her arm, around both eyes, and on her tongue were all pre-death
injuries.  There was evidence of manual strangulation-in particular, petechiae

17   in the eyes -- which, according to Arthur, was not consistent with emergency
medical efforts rendered an hour after death, as occurred here.  FN4.

18

19           FN4. In addition, although appellant did not admit to much in the way
of abuse of Latda, at trial he acknowledged saying, in response to a

20   question from Detective Cruz about a bruise on Latda's arm, "I don't
think I grabbed her that hard."  He also told Officer Warnock that, on
the night Latda died, he pushed her down onto the couch while they

21   argued.

22           Moreover, evidence that appellant had abused A.B. also showed that
appellant had committed domestic violence against a romantic partner, even if

23   in that case it was not Latda.  (See part I., B., 3, *post*.)

24           Second, there was extremely strong evidence to support the jury's
finding of implied malice second degree murder.  FN5.  Appellant's story

25   about what happened in the bathtub was incredible.  He acknowledged that he
had lied repeatedly to police and had instructed P.M. to lie as well.  He

26   testified that he was taking a bath with Latda just before she drowned and that
he also went under water when he submerged her in the water.  But P.M. saw

27   him right after the drowning and testified that appellant was not wet.
Appellant also testified that Latda did not react when he pushed her head

28   underwater, but P.M. testified that he told her he got the scratches on his arm

when he was forcing Latda's head under the water.  Moreover, the autopsy evidence strongly suggested that Latda was physically assaulted either shortly before or during the drowning and the water in her sphenoid sinus was indicative of her forceful attempts to breathe while under water.  Appellant also claimed that he did not know that Latda could drown as a result of his actions, yet he acknowledged that he held her head underwater, knowing she could not swim (which would indicate she did not know how to hold her breath under water), for up to a minute.  Finally, he testified that he left the apartment for close to an hour without summoning help even though he "didn't know if [Latda] was dead or alive."

> FN5. With respect to implied malice second degree murder, the trial court instructed the jury with CALJIC No. 8.31: "Murder of the second degree is also the unlawful killing of a human being when:
>
> > "One, the killing resulted from an intentional act;
> > "Two, the natural consequences of the act are dangerous to human life;
> > "And, three, the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.
> > "When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being."

There was also evidence that appellant was with Latda primarily for the purpose of obtaining permanent residency status in this country and that he was fed up with her.  For example, A.B. testified that in July 2006, shortly before Latda's death, appellant told her that "he had an interview with immigration about the papers."  He said he had to be living with his wife because they had an interview.  Appellant also expressed frustration to A.B. about Latda, "I am tired, I am fed up with her.  One of these days I am going to kill her."  FN6.

> FN6. Similarly, though less explicitly, appellant wrote letters to P .M., in which he told her, "I am right here in the darkness waiting to get out of here and be next to you dear angel. . . .  [W]hat I can do to have you with me, who -- how have to kill [sic ], what I have to do," and, "Oh, all my love. I don't know what I have to do or who do I have to kill, but -- but what I do know is that I'm sure . . . that it won't be impossible to like obtain your love.  And one day I can live with you for a long time."

In addition, P.M. testified that appellant told her he was thinking about her, her father, and his family while he was trying to "scare" Latda in the bathtub by forcing her head underwater.  Appellant told police just after Latda's death that she had said she was going to tell his family, her family, and P.M.'s family about him and P.M.

All of this evidence strongly supports the second degree murder verdict in that it demonstrates that appellant "deliberately" held Latda's head under water "with knowledge of the danger to, and with conscious disregard for, human life."  (CALJIC No. 8.31.)

In light of this varied and compelling evidence -- both direct and

circumstantial -- of (1) appellant's physical assault of Latda just before and/or while she drowned, as well as his physical abuse of A.B., and (2) his guilt of second degree murder, it is not reasonably probable that, had the testimony regarding Latda's statements to others been excluded, the result of the trial would have been different.  (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)  Accordingly, appellant suffered no prejudice from counsel's failure to object.  (See *id.* at pp. 694, 697.)

### 3. Whether A.B.'s Testimony Should Have Been Excluded Under Section 352

Finally, appellant contends that the evidence of his physical abuse of A.B. should have been excluded pursuant to section 352 because that evidence was more prejudicial than probative.  Appellant acknowledges that defense counsel failed to object to admission of this evidence on these grounds, but claims that such failure constituted ineffective assistance of counsel.  (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 688.)  We conclude there was no ineffective assistance of counsel because the trial court acted within its discretion when it found the evidence admissible.  (See *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1313-1316 [court's admissibility determination reviewed for abuse of discretion].)

Evidence is more prejudicial than probative under section 352 when "'it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." [Citation.]' [Citation.]"  (*People v. Jablonski* (2006) 37 Cal. 4th 774, 805.)  "Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s). [Citations.]"  (*People v. Rucker* (2005) 126 Cal. App. 4th 1107, 1119; accord, *People v. Jennings*, *supra*, 81 Cal. App. 4th at p. 1315.)

Here, the prior incident involving A.B. was plainly less inflammatory than the charged conduct, which involved the killing of Latda.  Similarly, it was highly unlikely that the jury would confuse the prior acts against A.B. with the drowning of Latda.  Further, the prior incident occurred within approximately one year of Latda's death.  FN7.  Finally, although the prior incident involved another woman, the evidence was probative as to Latda's killing in that it demonstrated appellant's propensity to commit domestic violence to dominate and subdue a partner in a romantic relationship.  Thus, this evidence, which did not pose an intolerable "'risk to the fairness of the proceedings or the reliability of the outcome,'" was clearly more probative than prejudicial.  (See *People v. Jablonski*, *supra*, 37 Cal. 4th at p. 805.)

FN7. Although appellant apparently was not convicted of the prior act of domestic violence against A.B.  (see *People v. Rucker*, *supra*, 126 Cal. App. 4th at p. 1119), given the disparity in severity between the two incidents, it is extremely unlikely the jury convicted appellant of murdering Latda to punish him for his earlier abuse of A.B.  (See *People v. Jennings*, *supra*, 81 Cal. App. 4th at p. 1315.)

Appellant asserts, nonetheless, that the evidence was not probative because it was not reliable in that A.B.'s version of events was disputed by appellant and his brother, FN8. and also because A.B. was a biased witness

due to her prior relationship with appellant.  These factual issues, which involve the credibility of witnesses, were before the jurors, whose job it was to weigh the competing testimony and evaluate credibility. (See *People v. Ochoa* (1993) 6 Cal. 4th 1199, 1206.)

> FN8.  Appellant's brother, Carlos Padilla, testified that he heard A.B. in the bedroom laughing like she was making fun of someone and then heard her scream, "Carlos."  He broke into the bedroom and found both appellant and A.B. standing by the door.

> In light of our conclusion that this evidence was properly admitted under sections 1109 and 352, appellant cannot show that counsel was ineffective for failing to object to its admission.  (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 688.)

(Op. at 18-24 (brackets added).)

Several circuit courts have upheld the use of propensity evidence under Rules 413 and 414 of the Federal Rules of Evidence.  *See*, *e.g.*, *United States v. Castillo*, 140 F.3d 874, 881 (10th Cir. 1998); *United States v. Mound*, 149 F.3d 799, 801 (8th Cir. 1998).  The Ninth Circuit has upheld the constitutionality of Rule 414, permitting admission of evidence of similar crimes in child molestation cases.  *See United States v. LeMay*, 260 F.3d 1018, 1024-25 (9th Cir. 2001), *cert. denied*, 534 U.S. 1166 (2002).  The court held in *LeMay* that Rule 414 is not unconstitutional because it is limited in its function by Rule 403.  *Id.* at 1026-27.  Rule 403 directs judges to exclude any evidence submitted under Rule 414 that is more prejudicial than probative.  *Id.* at 1027.  The court reasoned that this balancing process eliminates any due process concerns from Rule 414, stating: "As long as the protections of Rule 403 remain in place to ensure that potentially devastating evidence of little probative value will not reach the jury, the right to a fair trial remains adequately safeguarded." *Id.* at 1026.

The reasoning of *LeMay* applies equally to this case because the California rules are analogous to the federal rules.  Evidence that is admissible under sections 1109 is limited by section 352.  *See* Evid. Code §§ 1108(a), 1109(a)(1).  Section 352 parallels Rule 403 of the Federal Rules of Evidence because it permits a trial judge to exclude evidence when its probative value is substantially outweighed by its prejudicial effect.  *See id.* § 352.  As the California Supreme Court held in *People v. Falsetta*, the requirement under section 352 to balance the prejudicial effect of the evidence against its probative value ensures that evidence admitted

under section 1109 will not infringe on the right to a fair trial guaranteed under the Due Process Clause.  21 Cal. 4th 903, 913 (1999).

Finally, in *Estelle v. McGuire*, 502 U.S. 62 (1991), the United States Supreme Court expressly reserved consideration of the issue at hand.  Specifically, the Supreme Court has never held that the admission of propensity evidence violates the right to due process.  *See Estelle*, 502 U.S. at 75 & n.5 (declining to rule on the constitutionality of propensity evidence); *Alberni v. McDaniel*, 458 F.3d 860, 864-67 (9th Cir. 2006).  Because habeas relief may not be granted unless the state court decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, *see* 28 U.S.C. § 2254, and there is no Supreme Court precedent that admission of propensity evidence violates due process, the decision of the state appellate court cannot be said to have contradicted or unreasonably applied clearly established federal law in upholding the constitutionality of section 1109 and finding that this evidence was properly admitted.  *See Alberni*, 458 F.3d at 866-67 (under AEDPA, habeas relief cannot be granted on a claim Supreme Court has reserved); *id.* at 874-75 (although habeas relief may still be available after AEDPA on reserved issues, as to propensity evidence there is insufficient Supreme Court authority of any kind to clearly establish a due process right not to have such evidence admitted) (McKeown, J., concurring in part and dissenting in part).

In addition, the state appellate court found that the trial court properly evaluated the probative value of the evidence against its potential for prejudice under section 352.  As explained above, Petitioner challenges the admission of evidence of domestic violence against two women -- A.B. and the victim.  The Court will first handle the admission of evidence of domestic violence by Petitioner against A.B., presented through the testimony of A.B.  Then, the Court will turn to the admission of evidence of domestic violence by Petitioner against the victim, presented in the form of hearsay statements by the victim to friends and coworkers.

### 1.   Prior Acts of Domestic Violence Against A.B.

Petitioner contends that the evidence of the domestic violence against A.B. should have been excluded pursuant to section 352 because that evidence was more prejudicial than probative.  As explained above, the state appellate court noted that Petitioner "acknowledges that

defense counsel failed to object to admission of this evidence on these grounds, but claims that such failure constituted ineffective assistance of counsel." (Op. at 23.)  The state appellate court found that "the prior incident involving A.B. was plainly less inflammatory than the charged conduct, which involved the killing of Latda." (*Id.*)  Therefore, that court determined that there was no ineffective assistance of counsel "because the trial court acted within its discretion when it found the evidence admissible." (*Id.*)

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984).  In order to prevail on a claim of ineffectiveness of counsel, the petitioner must establish two factors.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687-68, "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Strickland*, 466 U.S. at 690).  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Ibid.*  Where the defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

It seems from the state appellate court's decision that the testimony of A.B. stood on a different basis than the hearsay testimony of the remaining domestic violence witnesses.  As discussed below, Respondent has conceded that the latter hearsay was "excludable under California law, and that on proper objection, it would have been excluded." (Answer at 20.) Respondent further "conceded that a showing of a violation of counsel's duties had been made out under the first prong of the test for ineffective assistance of counsel of *Strickland* . . . ." (*Id.*) However, Respondent argues that Petitioner was "unable to make the necessary showing under the second prong of *Strickland*, which requires petitioner to bear the burden of showing that there is a "reasonable probability" that but for counsel's unprofessional errors, the result would

have been different."[3]  (*Id.* (citing *Strickland*, 466 U.S. at 688, 694).)

In his traverse, Petitioner claims that his defense was that "he lacked that intent to kill and the jury struggled with that issue." (Traverse at 12.)  Thus, he argues that "the section 1109 evidence provided the jury with an impermissible shortcut to decide appellant's intent: because he had the intent to kill Latda on July 21." (*Id.* at 13.)  The state appellate court found that it was "unlikely that the jury would confuse the prior acts against A.B. with the drowning of Latda." (*Id.*)  A.B. testified that Petitioner had thrown her down on a bed and started hitting her on her face after they got into a verbal argument, and this prior incident took place within approximately one year of the murder.  The state appellate court determined that "the evidence was probative as to Latda's killing in that it demonstrated appellant's propensity to commit domestic violence to dominate and subdue a partner in a romantic relationship." (*Id.* at 24.)  Thus, the state appellate court concluded that "this evidence, which did not pose an intolerable '"risk to the fairness of the proceedings or the reliability of the outcome,"' was clearly more probative than prejudicial." (*Id.*)      Respondent argues that the second degree murder conviction did not require an *intent to kill*.  (Answer at 21.)  He further argues that "Petitioner cannot reasonably deny that he intentionally performed an act of extreme dangerousness, with knowledge of and conscious disregard for the danger to human life . . . [and that] those essentially undisputed facts established second degree murder." (*Id.*)  The state appellate court found that "there was extremely strong evidence to support the jury's finding of implied malice second degree murder." (Op. at 21.)  The state appellate court pointed out that Petitioner claimed "he did not know that Latda could drown as a result of his actions, yet he acknowledged that he held her head underwater, knowing she could not swim (which would indicate she did not know how to hold her breath under water), for up to a minute." (*Id.* at 21-22.)  As mentioned above, under CALJIC No. 8.31, as given to the jury, CT 244, second degree murder required the

---

[3] Respondent also notes that "the evidentiary error here was not one of federal constitutional magnitude." (Answer at 20.)  Respondent adds: "Petitioner does not contend, nor could he reasonably, that the hearsay was 'testimonial' in nature under *Crawford v. Washington*[,] (2004) 541 U.S. 36, given that the hearsay statements were made to friends and business colleagues, not to law enforcement personnel." (*Id.*)

1    prosecution to show that the killing resulted from an intentional act, which was deliberately

2    performed, with the knowledge of the danger and conscious disregard for human life.  The state

3    appellate court concluded that the evidence "strongly supports the second degree murder verdict

4    in that it demonstrates that appellant 'deliberately' held Latda's head under water 'with knowledge

5    of the danger to, and with conscious disregard for, human life.'"  (*Id.* at 22 (citing CALJIC No.

6    8.31).)

7         Also in his traverse, Petitioner claims that "the juror's questions during deliberations

8    revealed that they were struggling with second degree murder and voluntary manslaughter."

9    (Traverse at 18.)  Thus, he argues that "[h]ad the trial court excluded evidence of prior acts of

10   violence committed against Latda and [A.B.], it is reasonably probable that the jurors would

11   have reached a different result."  (*Id.*)  Respondent argues that Petitioner's attempt to "posit

12   confusion on the part of the jury from their questions is unpersuasive."  (Answer at 21.)  Instead,

13   Respondent claims that "it is plain that the jury was focusing on precisely the issues in CALJIC

14   No. 8.31, and that the trial court's correct answers allayed any doubt as to Petitioner's guilt."

15   (*Id.*)  This Court agrees, as shown by the record relating to the jury's questions below.

16        The record shows that the jury's first question concerned the definition of "intentional" in

17   CALJIC No. 8.31.  The jury's first question was as follows: "We, the Jury, request the following:

18   an explanation/definition of Malice Aforethought CALJIC [No.] 8.11.  The question relates to

19   item #1[.]  Is the intentional act 'the killing' or the 'act itself[?]' 'Examples[?]'"  SCT 2 (brackets

20   added).  Below is the colloquy between the foreman, juror number 12, and the trial court:

21        THE COURT: . . . . All right. I can't give you a great deal of guidance, but
          what I can tell you is that in item one, which reads the killing resulted from an
22        intentional act, it is the intentional act that results in the killing.

23        I don't know if that answers your question or not?

24        JUROR NUMBER 12: No.

25        THE COURT: It does not.

26        I can't define it for you any further, and I can't give you examples.  I'm
          not permitted to do so.
27
28        JUROR NUMBER 12: So -- the question was is the intentional act the killing,
          or is it the act that results in the killing?

THE COURT: The act that results in the killing.  Does that answer the question?

JUROR NUMBER 12: Yes.

9RT 1891.  Respondent argues:

> The only reasonable inference from this colloquy is that the jury was wondering whether petitioner's act of holding the victim's head underwater to scare her was sufficient to satisfy the intentionality requirement of CALJIC No. 8.31.  As the court correctly informed the [foreman], and as petitioner does not dispute, it was enough that petitioner intentionally held the victim's head under water, and the instruction did not require the jury to find that petitioner intended to kill.

(Answer at 22 (alteration added).)  Respondent also argues that "the jury's second question further supports this conclusion."  (*Id.*)  The record shows that the jury returned later to ask about the definition of heat of passion for voluntary manslaughter.  9RT 1893.  The jury's second question was as follows: "We, the Jury, request the following: Clarification[.]  Does the heat/passion mitigate malice?  Can you have malice and heat/passion?"  SCT 3 (brackets added).  The trial court directed the foreman to re-read the definition of heat of passion, which resulted in yet another question, as shown in the following colloquy:

> THE COURT: . . . I received your second note.  I would refer you back in your packet to 8.40, which is the definition of voluntary manslaughter.

> JUROR NUMBER 12: Okay.

> THE COURT: And I will direct you to the second paragraph, which reads every person who unlawfully kills another human being without malice aforethought, but either with an intent to kill or with conscious disregard for life, is guilty of voluntary manslaughter, in violation of Penal Code Section 192(a).

> There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion.

> So I think that answers your question, unless I'm reading it incorrectly.

> Then it goes on in 8.42 and 8.43 and several of the others to define heat of passion for you.

> Am I not getting your question?

> JUROR NUMBER 12: You answered the question.

> THE COURT: All right.  So you need to look to both 8.40 as well as the definitions of what heat of passion is.

JUROR NUMBER 12: So it is okay if I ask a question?

THE COURT: Sure.

JUROR NUMBER 12: So if it is heat of passion as defined there, then that would mitigate the -- or it would make it voluntary manslaughter?

THE COURT: If you find that the killing was a result of heat of passion --

JUROR NUMBER 12: Right.

THE COURT: -- the heat of passion negates the malice aforethought.

JUROR NUMBER 12: Right, but it has to be -- it has to meet the definition of heat of passion?

THE COURT: Correct, correct.

JUROR NUMBER 12: Not just random heat of passion

THE COURT: Correct, must be the definition that you have been given and all of that elements of that.

JUROR NUMBER 12: Correct.  Okay.

THE COURT: Does that answer everyone[']s[] question?

JUROR NUMBER 12: Uh-huh, sure.

THE COURT: Okay.  Great.

9RT 1895-1897.  Respondent argues that "the jury's concern seems clear."  (Answer at 23.) Respondent posits that "[a]pparently some jurors wondered if petitioner's mere excitement when he pushed the victim's head underwater may have been sufficient to qualify for heat of passion stemming from reasonable provocation."  (*Id.*)  The record shows that the trial court pointed out -- and the foreman claimed he understood -- that "just random heat of passion" was not sufficient. 9RT 1897.  Rather, the record shows that the trial court clarified that heat of passion must be such as is recognized by the law, stemming from provocation which would excite a reasonable person.  9RT 1897.  Respondent argues that the jury had "no difficulty after receiving these explanations in determining that petitioner was guilty of second degree murder . . . [and that] [n]othing in these colloquies does anything but emphasize the clarity of petitioner's guilt in this case."  Again, this Court agrees with Respondent and finds unavailing Petitioner's argument in his traverse that the jury's questions revealed that the jury was "struggling."  Furthermore, as

1   stressed above, the state appellate court found no prejudice because there was "extremely strong

2   evidence" to support the jury's finding of "implied malice second degree murder" as opposed to

3   heat of passion voluntary manslaughter.  (Op. at 21.)

4          Therefore, Petitioner has not shown that the trial court's admission of the aforementioned

5   testimony by A.B. violated any federal constitutional right or denied him a fundamentally fair

6   trail.  The state court's rejection of his claim regarding the admission of prior acts of domestic

7   violence against A.B. was not contrary to, or an unreasonable application of, clearly established

8   Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).  Accordingly, Petitioner is not entitled to

9   habeas relief on this basis.

10                          2.    Hearsay Testimony

11         As mentioned above, Petitioner also complains that his prior conduct, involving prior acts

12  of domestic violence against the victim, was proved by way of the hearsay testimony of the

13  victim's friend and coworkers.  The evidence was received in accordance with California

14  Evidence Code § 1370, an exception to the hearsay rule for certain trustworthy statements by

15  unavailable crime victims.  Petitioner claims that the aforementioned hearsay testimony was

16  inadmissible because it did not satisfy the requirements of section 1370.  As the state appellate

17  court again pointed out, Petitioner "acknowledges that defense counsel failed to object to

18  admission of this evidence on this ground, but argues that counsel thereby provided ineffective

19  assistance."  (Op. at 19.)  The state appellate court determined that "it is undisputed that Latda's

20  comments to her friends and coworkers did not satisfy subdivision (a)(5) of section 1370."  (*Id.*

21  at 20.)  (As mentioned above, Respondent concedes that the hearsay testimony was excludable

22  under California law.)  Therefore, the state appellate court analyzed whether defense counsel

23  was ineffective for failing to object on this ground, and it concluded that such an error did not

24  meet the prejudice prong of *Strickland*.  (*Id.*)

25         The state appellate court determined that the hearsay testimony should have been

26  excluded.  However, it ruled that no prejudice would have resulted because Petitioner has not

27  established that "there is a reasonable probability that, but for counsel's unprofessional errors, the

28  result of the proceedings would have been different."  (*Id.*)  The court determined that in light of

1    the compelling evidence of (1) Petitioner's physical assault of the victim before or at the time she

2    drowned, as well as evidence of a prior act of domestic violence against A.B., and (2) direct and

3    circumstantial evidence of his guilt of second degree murder, it was not reasonably probable that,

4    had the hearsay testimony been excluded, the result of the trial would have been different.  (*Id.* at

5    22 (citing *Strickland*, 466 U.S. at 694).)

6         Therefore, the state appellate court's rejection of his claim regarding the admission of

7    prior acts of domestic violence against the victim through hearsay testimony was not contrary to,

8    or an unreasonable application of, clearly established Supreme Court precedent.  *See* 28 U.S.C.

9    § 2254(d)(1).  Accordingly, Petitioner's request for habeas relief on this basis is denied.

10        B.    Trial Court Erred in Admitting Victim's Autopsy Photos

11        Petitioner next contends that his right to due process was violated by the admission into

12   evidence of photos of the victim's autopsy.  The photos were the subject of an objection made by

13   defense counsel prior to the prosecution calling forensic pathologist Dr. Kelly Arthur to the stand

14   to testify about the victim's autopsy.  Outside the presence of the jury, the trial court examined

15   the photos before ruling that some of them could be admitted at trial.  The state appellate court

16   outlined the factual background of this claim as follows:

17             Appellant objected, pursuant to section 352, to admission into
          evidence of any autopsy photographs of Latda, specifically arguing that some
18        of them were prejudicial because they showed the "mutilation done by the
          coroner, not [appellant]" and that some were cumulative.  After the prosecutor
19        withdrew several photographs that were duplicative, the trial court ruled that
          any problems with cumulativeness had been cured by the withdrawal of those
20        photographs, and found that the remaining ones were probative as they
          showed different angles of the injuries.  With respect to two particular
21        photographs -- exhibits 96 and 97 -- which showed a cross-section of Latda's
          brain where fluid was visible in the sinus, the court found that (1) it would be
22        clear to the jury that the pathologist had altered the body, and (2) exhibit 96
          was not cumulative to exhibit 97, which showed a close-up of the brain,
23        because exhibit 96 showed "the overall orientation of the sinus."

24   (Op. at 24-25.)  Specifically, the trial court explained the reasons in admitting the photos under

25   California Evidence Code § 352 as follows:

26             [H]aving reviewed those to the extent they are cumulative photos, I think
          those have been cured by the withdrawal of 78, 80, and 87.  I do see the
27        probative value of the other different angles, for example, of the injuries
          around the eyes in 71 and 73, one can get a more accurate depiction of the
28        injuries by having one more angle, so in that sense they are not duplicative

1   and they are probative.

2           I think 70 and 81 with the withdrawal of 78 and 80 are not duplicative.
    And again different angles show more clearly what probative value the
3   photographs have.

4           Similarly with 84, 85 and 86 I do think that they are probative and that
    different angles are relevant, the withdrawal of 87 removes much of the
5   duplication.

6           As to 96 and 97, it should be clear, I assume it will be clear, that these
    are photos taken after the pathologist has altered the body and removed areas
7   so that the interior of the body can be seen, so there is no suggestion that the
    interior of the body, or the cavity being opened was caused by the defendant.
8   Obviously, that's not an issue in this case.

9           The question is having -- whether the [sic] having 96 showing the
    overall orientation of the sinus in addition to 97 showing the specific evidence
10  is unduly prejudicial such that it substantially outweighs its probative value,
    and I don't think it does.  I think the probative value is particularly important
11  to the cause of death the orientation is important to the jury's understanding of
    that cause of death, and I don't think that once the jury understand they are
12  looking at the inside of a body cavity the coroner has opened the body that
    that would be so shocking or prejudicial to the defendant, it simply shows the
13  interior of the body where the evidence of the cause of death occurred, and it's
    essential to the People to prove the cause of death.  So I'm going to overrule
14  the objection to 96, and all of the others that I mentioned are withdrawn, and I
    believe their probative value outweighs the prejudicial effect.

15  6RT 1201-1203.

16
        The state appellate court found no error in the admission of the autopsy photos:
17
            "We review a trial court's ruling under section 352 for abuse of
18      discretion.  [Citation.]  On appeal, a trial court's exercise of discretion to admit
        evidence under that evidentiary statute is reversed only if 'the probative value
19      of the photographs clearly is outweighed by their prejudicial effect.'
        [Citations.]  Prejudicial in this context is 'evidence that uniquely tends to
20      evoke an emotional bias against a party as an individual' and has only slight
        probative value."  (*People v. Carey* (2007) 41 Cal. 4th 109, 128.)
21
            We have reviewed the 24 autopsy photographs in this case and
22      conclude that they are probative of how Latda died, as well as the injuries she
        suffered, which were relevant to proving that appellant acted with malice.
23      (See *People v. Carey*, *supra*, 41 Cal. 4th at p. 127 [autopsy photos' relevance
        not lessened because cause of death was undisputed]; *People v. Stitely*, 35
24      Cal. 4th at p. 545 [rejecting defendant's claim that photographs were
        "irrelevant or inadmissible simply because they duplicate testimony, depict
25      uncontested facts, or trigger an offer to stipulate"]; *People v. Memro* (1995)
        11 Cal. 4th 786, 865-866 [photographs not unduly prejudicial where they were
26      clearly probative of prosecution's theory that defendant killed with malice and
        they corroborated other evidence of circumstances surrounding murders].)
27      The photographs also helped to illustrate the testimony of the pathologist.
        (See *People v. Carey*, at p. 127 ["Autopsy photographs of a murder victim are
28      always relevant at trial to prove how the crime occurred; the prosecution need

not prove these details solely through witness testimony"].)

The autopsy photographs are of course "unpleasant, but not to the point of distracting the jury from its proper function." (*People v. Stitely*, *supra*, 35 Cal. 4th at p. 545.) Contrary to appellant's assertion, "jurors could 'distinguish between the wounds inflicted from the murder and the disfigurement caused by the autopsy.' [Citation.]" (*Ibid.*) In fact, during Dr. Arthur's testimony, as she described what the autopsy photographs depicted, she plainly told the jury which injuries were the result of her actions during the autopsy. For example, she identified exhibit 96 as "a photograph of the base of the skull after the brain has been removed," and answered in the affirmative when the prosecutor asked if she had previously testified that a saw was used to open up the scalp so she could remove the brain and see the internal cavities.

Finally, the jury was instructed, pursuant to CALJIC No. 1.00, not to be "influenced by pity for or prejudice against" appellant, and not to be "influenced by sentiment, conjecture, sympathy, passion, [or] prejudice." "We assume that the jurors followed that instruction [citation] and considered the photographs for their evidentiary value alone." (*People v. Memro*, *supra*, 11 Cal. 4th at p. 866.)

As our Supreme Court stated in *People v. Memro*, *supra*, 11 Cal. 4th 786, 866-867: "In the case of autopsy photographs as with any other, . . . the court enjoys broad discretion in deciding whether prejudice substantially outweighs probative value. [Citation.] Often their probative value can be considerable." Here, the trial court did not abuse its discretion when it concluded that the probative value of the autopsy photographs outweighed any prejudice. (See *People v. Carey*, *supra*, 41 Cal. 4th at p. 128.)

(Op. at 25-27.)

The trial court's evidentiary ruling may be addressed in a federal habeas action only if it violated federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Estelle*, 502 U.S. at 68; *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). "The admission of photographs lies largely within the discretion of the trial court, whose ruling will not be disturbed on due process grounds in a federal habeas corpus proceeding unless the admission of the photographs rendered the trial fundamentally unfair." *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982), *cert. denied*, 463 U.S. 1212 (1983).

The state appellate court's rejection of Petitioner's claim was not contrary to, and did not involve an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). The introduction of the gruesome photographs did not inherently raise "the spectre of fundamental unfairness such

as to violate due process of law." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1032 (9th Cir. 1997),

*cert. denied*, 525 U.S. 903 (1998) (citing *Estelle,* 502 U.S. at 67-68).  As the state appellate court

ruled, the gruesome photos at issue were the ones depicting the result of Dr. Arthur's

examination of the interior of the victim's body at the autopsy.  In her testimony, Dr. Arthur

described what each autopsy photo depicted and explained to the jury which injuries were the

result of her actions; therefore, the jury was well aware of the fact that such injuries were not the

result of Petitioner's actions.  Therefore, the inflammatory nature of the photographs was sharply

diminished, given that they did not reflect Petitioner's direct actions, and, furthermore, they did

not depict pain or suffering experienced by the living victim.  Moreover, the state appellate court

found that the autopsy photos aided the jury in understanding how the victim died and what

injuries she suffered.  The photos also were relevant to the issue of malice in the killing.  In

addition, the state appellate court pointed out that the jury was instructed with CALJIC No. 1.00,

which directed them not to be "influenced by pity for or prejudice against" Petitioner.  (Op. at

26.)  Given the instruction the jury received, it cannot be reasonably argued that the jury lost

possession of their ability to rationally evaluate the autopsy photographs and follow the trial

court's detailed legal instructions.

As mentioned above, the trial court considered the autopsy photos thoroughly -- allowing

the prosecutor to explain the relevance of the photos, allowing defense counsel to explain his

objection, and requiring both the prosecutor and defense counsel to explain their theories of the

case.  Thus, the trial court could then consider the relevance of the photos in light of the

respective theories -- to rule on the admissibility of the photos and do the balancing required

under California Evidence Code § 352 -- in order to conclude that the potential for prejudice did

not outweigh the photos' relevance.  *See* 6RT 1194-1203.  The admission of the autopsy photos

did not render the trial fundamentally unfair in violation of due process.  *See Kealohapauole v.*

*Shimoda*, 800 F.2d 1463, 1465-66 (9th Cir. 1986), *cert. denied*, 479 U.S. 1068 (1987) (black and

white videotape of victim's autopsy, although unpleasant, not so inflammatory as to inject

element of unfairness).

Therefore, the state appellate court's rejection of this claim was not contrary to, or an

1  unreasonable application of, clearly established Supreme Court precedent.  *See* 28 U.S.C.

2  § 2254(d)(1).  Accordingly, Petitioner is not entitled to habeas relief on this claim.

3        C.     <u>Trial Court Erred in Admitting Petitioner's Videotaped Statements</u>

4        Petitioner contends that the trial court violated his constitutional rights by admitting his

5  videotaped statements from the interview he gave to Detective Cruz (played for the jury during

6  rebuttal) because these statements were involuntary.

7        The record shows that there were two interviews of Petitioner at the police station -- the

8  first one soon after he was taken to the station by Officer Warnock at around 9:00 p.m. on July

9  21, 2006, and another afterwards by Detective Cruz at around 1:05 a.m. on July 22, 2006.  Prior

10  to the playing of Petitioner's videotaped statements for the jury, defense counsel objected to the

11  admission of both interviews.  8RT 1533, 1541; 9RT 1634-1641, 1655.  Defense counsel also

12  asked for his "*Miranda*[4] objection to be a continuing objection through the course of this

13  interview."  8RT 1557 (footnote added).  The Court notes that the record shows that Petitioner's

14  *Miranda* rights were not given prior to or during either of the two interviews.  The record also

15  shows that the interview by Detective Cruz ended around 4:00 a.m., at which time Petitioner was

16  arrested for murder.

17        The state appellate court set out the following facts relating to the challenged videotaped

18  statements:

19          Defense counsel objected to admission of appellant's videotaped
   interview with Detective Cruz on both Fifth and Sixth Amendment grounds.
20  FN10.  After arguments from both defense counsel and the prosecutor, the
   trial court ruled that there was no Fifth Amendment violation because
21  appellant "was not in custody until he was formally arrested.  [¶]  He did not
   invoke his right to counsel at the beginning of the interview or at any time that
22  I heard unequivocally.  [¶]  And, third, he was speaking very voluntarily . . .
   from what I have seen, as opposed to his free will being overborne by
23  coercive tactics by the police.  [¶]  So I find that the interview was both
   voluntary and was consistent with his 6th Amendment right to counsel."

24
           FN10. Contrary to respondent's argument, we find that counsel's
25          objection was sufficiently specific to preserve the issue for appeal.

26          At the beginning of the interview with Detective Cruz, appellant said
   that he had been told that he should not talk to police before consulting with a
27

28      [4]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

lawyer. He later said, "I don't know if I should talk or not shut up, you know, what can I say, what can I not, I don't know." Still later, when appellant said he was confused and wanted to go, he ultimately insisted on ending the interview, despite Cruz's efforts to prolong it, and went outside to speak to his family, with Cruz standing nearby. However, appellant returned to the interview room after his family apparently convinced him to continue with the interview.

Towards the end of the interview, after Cruz had become more aggressive and accusatory in his questioning, appellant said he felt "like I'm here having a lot of people . . . [¶] . . . [¶] making me look guilty . . . ." Appellant then asked if he could come back the next day. When Cruz said no, appellant said he was not going to talk any more. Then Cruz and another officer (Officer Ramirez) left the room after Cruz told appellant, "Hey Jaime, don't leave the room. Stay in the room. Okay." Appellant then opened the door to the room. Officer Ramirez was outside the door, and appellant first asked if he could smoke, then said he was tired and wanted to go home. He also said he wanted "to talk to a lawyer because it's really going bad, okay." Cruz, who had returned, said, "Let's go talk." At that point, the two officers and appellant reentered the interview room.

Cruz then said that it was 3:40 in the morning and they were all getting tired and "[w]e got to wrap this up pretty soon okay." He then began questioning appellant again. Even as appellant again told Cruz, "You said I could go home," Cruz continued to go over appellant's statement after saying, "Oh, no, it's just, it's just getting late, and I just keep going over your statement and it just keeps changing. . . ." Cruz then continued to ask appellant about the sequence of events the previous night for quite a while, before asking if appellant would be willing to take a lie detector test. Appellant said he would, but he would not do it right then; he was tired. Cruz said, "No, it's going to be now, we can't wait till later." Appellant then said, "I can't do it now. I need to talk to a lawyer. I need to see where I am at. I want to see, you know, it's definitely obviously [sic] that you guys try to blame as much as you can. It's obvious that I look as guilty anyone else could be, I swear to God I did not kill my wife. I swear to God."

Cruz then said, "Stay here. You are not free to go now." When appellant asked why not, Cruz said, "Because . . . I have a lot more questions." Cruz briefly left the room. While he was gone, Ramirez attempted to engage appellant in conversation. Appellant said that when he came in, he was "afraid about [P.M.], about fucking with a minor. At this point, in the way it's turned bad now. [¶] . . . . [¶] I'm not afraid about that [P.M.'s being a minor], because you guys tried to get me involved in something totally worse, you know. That's why I had to lie, that's why I had to cover [P.M.] because I walk in here, in here as a free man. I walk in here with no guilt in me. I wasn't guilty of nothing." When Cruz returned to the room, he arrested appellant for murder.

(Op. at 27-29 (brackets in original).)

There is no other state court opinion which summarizes these facts relating to these two interviews and the respective objections made by defense counsel, which are all relevant to Petitioner's claim. Instead, Respondent has summarized the background facts relating to this

1   claim in his memorandum of points and authorities in support of the answer.  There is nothing in

2   the record that indicates that Petitioner disputes the underlying course of events.  In his traverse,

3   Petitioner merely "clarif[ies] the relevant factual background in addressing this issue."

4   Therefore, the Court will also consider Petitioner's factual background.  The Court has reviewed

5   the facts and agrees with both Respondent's and Petitioner's interpretations.  Accordingly, the

6   Court includes both interpretations below.

7         Respondent begins his factual background with a "brief repeat" of Petitioner's trial

8   testimony prior to including his interpretation of the background facts relating to Petitioner's

9   claim.  Because the videotaped statements from Petitioner's interview were being offered in

10  rebuttal to impeach his testimony at trial, the Court includes Respondent's summary of

11  Petitioner's trial testimony as well as Respondent's interpretation of the background facts relating

12  to this claim as follows:

13         Petitioner set out his history with [A.B., P.M.] and the victim.  He
    admitted his sexual relationships with [A.B. and P.M.]  He also admitted his
14  extremely contentious relationship with the victim, which was, of course,
    predictable, given her awareness of his repeated infidelity with [A.B. and
15  P.M.]  Petitioner then testified that he intentionally held the victim's head
    under water for an extended period of time.  Petitioner did not remove the
16  victim from the bathtub, but rather put a pillow under her head.  He claimed
    he performed CPR for five minutes, but it did no good.  He did not call the
17  authorities because he was afraid they would not believe him.  He admitted
    that he decided to tell the police that it was a suicide.  He admitted he told
18  Officer Warnock that he left the apartment, and when he returned he smelled a
    strange smell and found the victim in the tub, cold, with no pulse.
19
           He testified that stories that he told the police about his slapping and
20  pushing the victim were true.  Petitioner testified that he lied to Officer
    Warnock at the scene, but that Officer Warnock was a very nice person.  At
21  the station, officers told him that he was free to go, but, although the door was
    unlocked, they would not let him leave.  Officers took him out of the room
22  two or three times to smoke.

23         Officer Warnock testified that petitioner told him at the scene that he
    and the victim had argued about his cheating.  (8RT 1521-1522, 1525.)
24  Petitioner said that he left to cool down, and came back and started watching
    TV.  Later, he looked for the victim and found her in the tub.  (8RT 1526.)
25  There had been no physical confrontation.

26         Officer Warnock testified he took petitioner to the station to talk.  He
    told petitioner that the door was closed for privacy, but that petitioner was not
27  under arrest.  He also talked with petitioner in the parking lot while petitioner
    smoked.  (8RT 1528-1529, 1531.)  [P.M.] had earlier testified that petitioner
28  told her he would tell the authorities that it was a suicide.  (3RT 672.)

The tape recording of the station house interviews was played for the jury as part of the prosecution's rebuttal case. (We refer to the transcript of the interviews, contained in a supplemental clerk's transcript, as SCT.) The tape begins with Officer Warnock escorting petitioner into an interview room at the police station. Officer Warnock tells petitioner as he temporarily leaves the room to "just pick up the phone and dial 9 . . ." if he wishes to talk to his mother. Petitioner in fact used the phone and called his brother. (SCT 8-10.)

Petitioner described the incident when Latda came home and saw petitioner with [A.B.], and Latda entered the apartment through the window. (SCT 16-19.) Petitioner stated that the victim was always arguing about something. Once, during an argument about [A.B.], the two yelled at and pushed each other. (SCT 51-53.) The night of the incidents, after petitioner drove [P.M.] home, he returned to the apartment but did not see the victim. (SCT 71.) He started watching the movie on TV for about 10 minutes when he smelled a bad smell. (SCT 72.) He walked into the bathroom and saw the victim. He tried to pull her out of the water and saw water coming out of her nose. (SCT 73.) He started CPR, in which he had some training, but stopped when he realized the victim was cold. (SCT 73-74.)

At about 1:05 a.m., Detective Cruz entered, and began his interview. (SCT 95.) Cruz began by telling petitioner: "Listen, you're not under arrest. You are free to go at any time if you want to. I just want to close this door for privacy. You understand that?" (SCT 95.) Petitioner replied: "Yeah." (SCT 95.) When Detective Cruz stated he just wanted to know what was going on, petitioner said that he was talking to "this guy" who told him that it would be better if petitioner talked to him first. When Detective Cruz asked who the guy was, petitioner replied that he was "like a lawyer" and that the guy told him that he didn't want to say something wrong because his English was not good, and it could be used against him. Petitioner said that he was uncomfortable, that his family was scaring him, and he didn't want to "totally freak out here . . . ." (SCT 95.) Detective Cruz told him to take a breath. Petitioner asked if he could just go and come back tomorrow. The following colloquy occurred:

SANCHEZ: All right. If you say I can just go, can't I just go and --

CRUZ: You can go any time, but I just want --

SANCHEZ: -- and come back tomorrow or --

CRUZ: You're free to go at any time. I'm not stopping you. The door's been closed for privacy, but first of all, I am sorry about what happened. I am terribly sorry that you had to come home and find what you did, but I wasn't there, and I need to find out what happened because, if something bad happened, wouldn't you want me to find out to catch the responsible person?

SANCHEZ: Okay.

CRUZ: So, you were there, and you saw a lot of things that I need to know, and I was hoping that maybe you can tell me what happened today. That's all I'm going to ask you.

SANCHEZ: Okay.

CRUZ: Is that okay?  Let me ask you first, can you tell me about your relationship with your wife?  You know, where you met her?  How you guys have been going out.  Can you tell me about that first?

SANCHEZ: I met her at work.

SCT 96.

The conversation then continued.  Petitioner told Detective Cruz essentially the identical story that he had told Officer Warnock.  Petitioner stated that he did not know how she did it, but that he "kind of believed" that Latda committed suicide.  (SCT 103.)  He later repeated that he believed that "she drowned herself."  (SCT 115.)  After more questioning, as petitioner acknowledges, he himself "terminated the interview . . . ."  (AOB 36.)

Detective Cruz testified that at this point he escorted petitioner out of the interview room, because the station was a secure facility.  He did not interfere as petitioner walked out of the building.  (9RT 1652.)  Petitioner stood outside and spoke to several of his family members, including his brother Carlos and his mother Sylvia.  Detective Cruz testified that at that point, his brother gave him a cigarette, and they talked among themselves. Detective Cruz was about 15 feet away, but could still see him talking to his family.  Detective Cruz "just waited. I wanted to see if they were going to drive away or what was going to happen, because they weren't actively leaving the parking lot, they were just standing there."  (9RT 1652.) Detective Cruz stated that he was not sure how much time elapsed, but that petitioner finally walked back to Detective Cruz and said "Okay, let's keep talking."  (*Id.*)  Detective Cruz told petitioner that he wanted to talk inside, and they walked back upstairs and resumed the interview.  (9RT 1653.)

As petitioner concedes, it was hours later before petitioner again attempted to terminate the interview.  While the detectives continued to ask petitioner questions, little of substance followed that later request.  Detective Cruz asked petitioner whether he was willing to take a polygraph examination, and petitioner stated he would, but not that night.  (SCT 174-175.)  Petitioner was arrested shortly thereafter.

The trial court made several rulings.  First, the trial court stated that no *Miranda* violation (*Miranda v. Arizona* (1966) 384 U.S. 436) was shown.  Its "conclusion based on the evidence was that Mr. Sanchez was not in fact subjected to custodial interrogation, because he was not in custody as that term is defined for purposes of *Miranda*."  (8RT 1556.)  The court stressed the factors that petitioner was advised that he was not under arrest, he was not handcuffed as he was taken for an interview, he was told he could leave at any time, and he was given breaks.  (8RT 1556-1557.)

Acknowledging the prosecutor's point that the tape was only played in the prosecution's rebuttal case, the trial court then addressed voluntariness. The court stated that it found that there was no coercion or pressure on petitioner, that Officer Warnock was "very low -- keyed, very collegial, conversational," and, that in addition to offering soft drinks and breaks, Officer Warnock did not conduct himself "in any way that would overbear Mr. Sanchez's freedom to choose whether to speak or not."

The trial court later revisited the ruling with regard to the portion of

the tape in which Officer Warnock interviewed petitioner. The trial court reaffirmed its ruling that the interview was voluntary, and noted that petitioner's ultimate arrest at the end of the process was irrelevant to that inquiry. (9RT 1642.) The court emphasized that petitioner was repeatedly told that he was not under arrest, and that he was free to leave, and that Officer Warnock was low key and conversational throughout the interview. The court also noted that petitioner's initial reference to an attorney would not qualify as an invocation of his right to counsel under *Miranda* because it was "not a request at all, it's a recitation of the discussion with a friend as to the advisability of being represented, but I don't hear anything that suggests an invocation of the right to counsel . . . ." (9RT 1643.)

(Answer at 30-34 (brackets added).)

In his traverse, Petitioner included the following factual background:

> It is important to clarify the relevant factual background in addressing this issue. During rebuttal, the prosecution put Officer Warnock on the stand and played a portion of the taped interview involving appellant and Officer Warnock. (8RT 1540.) After viewing this portion of the interview tape, the trial court memorialized its ruling on the "*Miranda*" issue. (8RT 1556.) The trial court, at that point, had not seen the portion of the taped interview with Detective Cruz. Defense counsel asked for a continuing objection as the prosecution planned to continue playing the portion of the taped interview including Officer Warnock. (8RT 1557.) The trial court stated that there was no need to renew the defense objection since counsel had previously viewed the tape. (8RT 1558.) At any rate, the trial court noted that the defense objection was preserved for the record and any change in facts would require a renewed objection. (8RT 1558.) After Officer Warnock finished his testimony, the prosecution played the portion of the taped interview involving Officer Warnock. After one other witness, the prosecution put Detective Cruz on the stand. (8RT 1597.) Detective Cruz testified as to some preliminary facts and the day ended. (8RT 1597-1616.) When trial resumed, the prosecution's rebuttal case continued. (9RT 1620.) Prior to Detective Cruz re-taking the stand, defense counsel objected to the voluntariness of appellant's statements to Detective Cruz. (9RT 1634.) This discussion fills 10 pages of the record. (9RT 1634-1644.) The trial court overruled defense counsel's objections under the Fifth and Sixth Amendments. (9RT 1644.) The portion of the taped interview involving Detective Cruz was played for the jurors. (9RT 1650.)

(Traverse at 24-25.)

In *Miranda*, the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted into evidence. *Miranda* protections are triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)). "[I]n custody" means "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v.*

1  *Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation marks omitted).  It requires

2  that "a reasonable person have felt he or she was not at liberty to terminate the interrogation and

3  leave," as judged by the totality of the circumstances.  *Thompson v. Keohane*, 516 U.S. 99, 112

4  (1995).

5  The state appellate court rejected Petitioner's claim, applying both United States Supreme

6  Court and state case law.  (Op. at 29-33.)  It concluded that there were factors that could have

7  affected the voluntariness of the interview.  (*Id.* at 30-32.)  For example: (1) the interviews took

8  place in the police station's interview room behind a closed door; (2) both interviews lasted a

9  total of "some seven hours;" (3) Petitioner "expressed concern about talking to police and about

10  whether he should speak with a lawyer first;" (4) there was a "certain level of police coercion

11  from the beginning;" and (5) Petitioner was not permitted to leave the room without an escort.

12  (*Id.*)  However, the totality of the circumstances demonstrated that a reasonable person would

13  have believed he was free to end the interview and leave the station.  (*Id.*)

14  Neither *Miranda* nor its Supreme Court progeny set down any bright line rule or specific

15  test for determining when someone is in custody and instead, suggested that the totality of the

16  circumstances of each case must be examined to determine whether there was custody.  *See*

17  *Yarborough v. Alvarado*, 541 U.S. 652, 661-62 (2004).  Because the Supreme Court's test for

18  determining custody is a general standard, the range of reasonable judgments by a state court on

19  this issue is broad.  *See id.* at 663-64.  The issue of whether a suspect is "in custody," and

20  therefore entitled to *Miranda* warnings, presents a mixed question of law and fact, requiring

21  independent review by the federal habeas court.  *See Thompson*, 516 U.S. at 107-110 & n.9.  The

22  custody determination for *Miranda* purposes requires two inquiries.  First, the state court must

23  determine what the circumstances surrounding the interrogation were.  That is a factual inquiry,

24  entitled to a presumption of correctness under 28 U.S.C. § 2254(d).  *See id.* at 112-13.  Second,

25  given those circumstances, the state court must determine whether a reasonable person would

26  have felt he was not at liberty to terminate the interrogation and leave.  This second inquiry calls

27  for an application of the controlling legal standard to the historical facts and presents a mixed

28  question of law and fact qualifying for independent review by the habeas court.  *See id.*  The

Ninth Circuit has identified several factors relevant to the "in custody" determination:

> Pertinent areas of inquiry include [1] the language used by the officer to summon the individual, [2] the extent to which he or she is confronted with evidence of guilt, [3] the physical surroundings of the interrogation, [4] the duration of the detention and [5] the degree of pressure applied to detain the individual. Based upon a review of all the pertinent facts, the court must determine whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.

*United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981).

Here, applying the factors set forth in *Booth*, the Court concludes that the state appellate court's decision was not an unreasonable application of clearly established law. *See* 28 U.S.C. § 2254(d). First, the state appellate court determined that Petitioner's "initial comments about a lawyer and questions about whether he should continue the interview were not invocations of his rights to a lawyer and to remain silent." (Op. at 31.) Petitioner was also free to leave because the state appellate court acknowledged that the record showed the door "was closed for privacy." (*Id.*) The state appellate court also pointed out that Petitioner was actually permitted to leave the police station during the interview in order to speak with his family, and that it was by his own choice that he returned to the interview "because his family had convinced him to do so, not because [Detective] Cruz forced him to." (*Id.*) Second, the state appellate court determined that Petitioner's "story changed very little from the original story he gave to Officer Warnock at his home and at the station . . . ." (*Id.*) Finally, the state appellate court stressed that "more importantly, [Petitioner] maintained his innocence until the bitter end." (*Id.*) As explained above, in a footnote, the state appellate court noted:

> This case is thus distinguishable from cases in which the defendant ultimately confesses to the crime during an involuntary interview. (Compare, e.g., *People v. Neal* (2003) 31 Cal. 4th 63, 86-87 [where defendant gave two detailed, consistent confessions to police, which "functioned as the veritable 'centerpiece of the prosecution's case,'" error in admitting confessions at trial was not harmless beyond a reasonable doubt].)

(*Id.* at 32 note 12.) Under these circumstances, because there exist factors both for and against a finding of whether Petitioner was "in custody," and because the state court weighed similar factors to determine Petitioner's custodial status, the state court's application of clearly established law was reasonable. *See Yarborough*, 541 U.S. at 664-65 (recognizing that the

1   custody test is a general one which entails giving state courts more leeway in reaching case-by-

2   case results); *Stanley v. Schriro*, 598 F.3d 612, 618-19 (9th Cir. 2010) (citing *Yarborough* and

3   denying habeas relief because "the state court delineated and weighed factors comparable to

4   those the Supreme Court has considered"); *see*, *e.g.*, *Beheler*, 463 U.S. at 1125 (concluding that

5   Beheler was not "in custody" even though police suspected him of the crime and interview took

6   place at police station); *Mathiason*, 429 U.S. at 495 (finding no indication that the questioning

7   occurred where the suspect's freedom to leave was restricted even though the police interviewed

8   the suspect at the police station, indicated that they believed he was involved in the burglary but

9   informed him that he was not under arrest).

10          Therefore, the state appellate court's rejection of this claim was not an unreasonable

11   application of clearly established federal law.  *See* 28 U.S.C. § 2254(d).  Accordingly, Petitioner

12   is not entitled to habeas relief on this claim.

13                                          **CONCLUSION**

14          For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

15          The federal rules governing habeas cases brought by state prisoners require a district

16   court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its

17   ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  Petitioner has

18   not shown "that jurists of reason would find it debatable whether the petition states a valid claim

19   of the denial of a constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

20   Accordingly, a COA is DENIED.

21          The Clerk of the Court shall enter judgment in favor of Respondent and close the file.

22          IT IS SO ORDERED.

23   DATED: _____12/14/11_____                        _Lucy H. Koh_

24                                                    LUCY H. KOH
                                                      United States District Judge

25

26

27

28